In re AMERICA'S HOBBY CENTER, INC., and America's Hobby Center, Inc., a Delaware Corporation, Debtor.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF AMERICA'S HOBBY CENTER, INC., Plaintiff,

v.

HUDSON UNITED BANK, Defendant.

**Bankruptcy No. 97 B 47390(TLB).
Adversary No. 98–8299.**

United States Bankruptcy Court,
S.D. New York.

Aug. 7, 1998.

Van Borkulo–Nuzzo & Scarpulla by Saliann Scarpulla, Mahwah, NJ, for Hudson United Bank.

Law Offices of David Carlebach by David Carlebach, New York City, for Official Committee of Unsecured Creditors.

## OPINION ON HUDSON UNITED BANK'S MOTION TO DISMISS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR NUNC PRO TUNC APPROVAL OF ITS ADVERSARY PROCEEDING

TINA L. BROZMAN, Chief Judge.

Having little leverage and a pressing need for cash with which to operate, chapter 11 debtors not fortunate or well-heeled enough to have acquired postpetition financing typically ratify their prepetition lending agreements and waive the right to challenge the lender's security interest in return for the lender's agreement to the debtor's use of the lender's cash collateral. Through this vehicle, those debtors obviate expensive and potentially unsuccessful court battles for authority to use their own cash. Almost always, these cash collateral stipulations (albeit sometimes only through the intercession of the judge) reserve to the creditors' committee, acting on behalf of the estate, the ability to challenge the perfection, enforceability, or priority of the liens. And frequently, if the creditors' committee wishes for its counsel to be paid for its efforts out of the lender's collateral, that right to sue is circumscribed by an outside date. With such agreements in place here, the question which arises in this motion to dismiss the creditors' committee's adversary proceeding is whether the committee has been relieved from the obligation imposed in this Circuit by *Unsecured Creditors' Committee v.*

*Noyes (In re STN Enterprises),* 779 F.2d 901, 904 (2d Cir.1985) to secure court approval before instituting suit on behalf of the estate. I conclude that the stipulation did not confer standing to commence an adversary proceeding; the creditors' committee still needed court approval to sue in the estate's behest.

### I.

The facts are drawn from the allegations of the complaint. Shortly after filing its bankruptcy petition, America's Hobby Center, Inc., the debtor,[1] on·notice to its creditors, asked for approval of its proposed cash collateral agreement with Hudson United Bank. Initially, the committee of unsecured creditors (the "Committee") opposed the debtor's request. Negotiations, however, culminated in an agreed order. That order gave the Committee thirty days "to object to the validity of" the bank's security interests. By the time the Committee had finished its investigation, the set period was about to expire. So as not to jeopardize its ability to contest the security interests and without seeking court approval, the Committee filed an adversary proceeding seeking to equitably subordinate the bank's claim to those of the unsecured creditors; to estop the bank from claiming secured indebtedness in any amount in excess of $798,000; for a declaratory judgment that the debtor's guarantee of a certain mortgage gives rise, at best, to an unsecured claim or, alternatively, is a voidable fraudulent transfer; to recover payments made by the debtor under the challenged mortgage; for a declaratory judgment that the bank's asserted security interest in a certain trademark is unperfected and therefore avoidable; and to require the bank to satisfy its indebtedness first out of the proceeds of certain collateral which does not constitute property of the debtor's estate.

Fortified by an affidavit in support from the debtor, the bank moves to dismiss the adversary proceeding for want of standing because of the Committee's failure to obtain prior court approval to sue on behalf of the

---

1. There were actually two debtors, incorporated in different states but bearing the same name. Because their estates have been substantively consolidated, for ease of reference I will refer to them as though there were but a single debtor.

estate. The Committee responds that it was vested with standing by the court-approved stipulation affording it thirty days in which to object to the bank's security interests, security interests which were ratified by the debtor. Accordingly, the Committee argues, court approval is not required inasmuch as the Committee is not usurping the debtor's province. Should these arguments prove unpersuasive, the Committee alternatively urges that court approval is required only for those claims belonging exclusively to the debtor and not for those that the creditors can bring. In any event, says the Committee, it is entitled to retroactive approval,[2] relief which the bank deems unwarranted for two reasons: the Committee cannot show that the debtor unjustifiably refused to sue and the complaint as filed lacks merit.

## II.

The questions posed by the parties are several. First, must a creditors' committee seek court approval before commencing an adversary proceeding on the debtor's behalf where, pursuant to a stipulated order among the debtor, the creditors' committee and the defendant, the debtor in possession cannot bring the action? Second, does language in a court-approved stipulation providing that the creditors' committee has a defined time period within which to challenge the secured creditor's entitlement substitute for court approval? Third, assuming that court approval is required, may the court grant *nunc pro tunc* authorization to the creditors' committee to commence the action? And finally, if retroactive approval is available, what standard must the court apply when considering whether to grant it?

## III.

A. *The Cash Collateral Agreement and Order Do Not Implicitly Authorize This Adversary Proceeding*

■ Whether a plaintiff has standing to institute suit ordinarily requires a two-tiered

analysis. *See Mihnlong Enterprises, Inc. v. New York Int'l Hostel, Inc. (In re New York Int'l Hostel, Inc.)*, 157 B.R. 748, 752 (S.D.N.Y.1993), *aff'g* 142 B.R. 90 (Bankr. S.D.N.Y.1992). The court must first determine whether the plaintiff has standing under the Constitution and then under certain judicially-engrafted prudential principles, including whether the plaintiff's claims fall within the zone of interests to be protected or regulated by the statute in question. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *New York Int'l Hostel*, 142 B.R. at 94; *see also In re Pointer*, 952 F.2d 82, 85 (5th Cir.), *cert. denied*, 505 U.S. 1222, 112 S.Ct. 3035, 120 L.Ed.2d 904 (1992). We skip the first inquiry here, however, because the bank wisely challenges only statutory standing.

■ Whereas a trustee (or, where a debtor is in possession, the debtor in possession) has explicit statutory authority to institute suit on behalf of the estate with which he or she is entrusted, *see* 11 U.S.C. §§ 323, 704, 1106 and 1107, there is no such explicit authority for creditors' committees to initiate adversary proceedings. *See STN Enterprises*, 779 F.2d at 904. Pointing to sections 1103(c) and 1109(b) of the Bankruptcy Code, the Second Circuit in *STN Enterprises* held that there is an implied but qualified right for creditors' committees to bring actions on behalf of the estate with the approval of the bankruptcy court if the debtor in possession "unjustifiably fail[s] to bring suit." *Id. See Chemical Bank v. Pilevsky*, 1994 WL 714287 at *2 (S.D.N.Y.1994).

The Committee suggests that the standing required to be conferred by the bankruptcy court on a creditors' committee has already been conferred by the order approving the

---

**2.** The Committee contends that its equitable subordination, judicial estoppel and equitable estoppel claims belong, not to the debtor, but to the creditors, and, thus, do not require court approval. There is no need to hack my way through that thicket inasmuch as the Committee during oral argument waived both the judicial estoppel

and equitable subordination claims if its fraudulent transfer claims survive this motion to dismiss, which they do. As to the equitable estoppel claim, "ownership" is also irrelevant; I conclude that it is subject to dismissal either because it is not colorable or because it fails to state a claim.

cash collateral stipulation. The underpinning for its argument is contained in two paragraphs, the first of which provides, so far as germane, "that the pre-Chapter 11 notes and other loan and security agreements.... entered into between [the bank] and the Debtor... together with the security interests provided for thereunder, be and the same, are affirmed, ratified and adopted, without defense or offset, by the debtor, *except that the committee of unsecured creditors shall have thirty days from the date of entry of this Order to object to the validity of [the bank's] security interests.*" (Emphasis added.) The second paragraph to which the Committee refers provides that the debtor's obligations to the bank have priority in payment over all other liabilities except for certain expressly excluded ones, including fees of the Committee's professionals which "were not incurred in connection with any challenge to, or investigation of, the validity, perfection, priority or extent of the security interests and liens granted to [the bank] by the Debtor prior to the petition date (*unless such challenge is made within 30 days of the entry of this Order*)." (Emphasis added.)

 An argument much the same as the one mounted here was proffered, and rejected, in *Crowthers McCall Pattern, Inc. v. Lewis,* 114 B.R. 407 (S.D.N.Y.1990), except that there, unlike here, the debtor supported the creditors' committee's suit and had entered into a stipulation with the committee, approved by the court, which explicitly vested the committee with the right to conduct discovery and institute suit. The court held that even in those circumstances *STN Enterprises* admits of no exception—the court must determine whether the suit which the committee wishes to interpose ought be permitted. *See id.* at 409. I am in accord; there is good and sufficient reason to hold that a creditors'. committee does not have unfettered discretion to sue simply on its own say-so.[3] Prior approval of committee-commenced adversary proceedings is required because it "promotes the fair and orderly administration of the bankruptcy estate by providing judicial supervision over the litigation to be taken." *See Catwil Corp. v. Derf II (In re Catwil Corp.),* 175 B.R. 362, 364 (Bankr.E.D.Cal.1994) *(quoting In re Curry and Sorensen, Inc.,* 57 B.R. 824, 828 (9th Cir. BAP 1994)). It must be remembered that the fees of a creditors' committees' professionals are generally absorbed by the debtor in possession pursuant to the statutory scheme. *See* 11 U.S.C. § 330(a)(1). The debtors' professionals are circumscribed by the willingness of the debtor to pay the expenses of litigation. The committee's professionals are not so circumscribed, however, in the absence of a requirement for court approval, because the debtor need not agree with the decision to sue. To allow such unsupervised litigation may saddle the debtor in possession with expenses which threaten its reorganization prospects or, where the debtor is liquidating, will consume much of the estate, yet promise insufficient return to creditors. In other words, careful analysis may suggest that imposition of a suit is unwarranted for any one of a number of reasons.

The requirement of prior approval affords both the debtor in possession and defendant with notice that the creditors' committee intends "to assert the right of the debtor-in-possession." *Id.* at 365. And it provides the debtor in possession with the opportunity to present its reasons for not prosecuting the claim. *See id.; In re Chemical Separations Corp.,* 32 B.R. 816, 819 (Bankr.E.D.Tenn. 1983); *cf. A.P. Industries, Inc. v. SN Phelps & Company (In re A.P. Industries, Inc.),* 117 B.R. 789 (Bankr.S.D.N.Y.1990)(debenture holders, without seeking court approval, brought state court actions against the debt-

---

3. I do not mean to suggest that the Committee had no right to object to the *amount* of the secured claim absent court approval, for the Bankruptcy Code itself vests all parties in interest with the right to object to claims, albeit that, in the first instance, as a matter of common practice that right is generally exercised by the trustee or debtor in possession. 11 U.S.C. § 502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest...objects.") An objection to a claim does not require an adversary proceeding; but when that objection is joined with a request for relief such as to avoid a lien or subordinate a valid security interest, an adversary proceeding must be commenced and *STN Enterprises* is implicated. *See* Fed. R. Bankr.P. 3007.

or's directors and officers seeking to avoid alleged fraudulent transfers by the debtor even though the proposed plan dealt with the claims asserted and the actions might threaten the viability of the plan; the court held that the claims were property of the debtor's estate such that their assertion violated the automatic stay and warranted the imposition of sanctions); *In re Grossinger's Associates*, 184 B.R. 429, 436 (Bankr.S.D.N.Y.1995)(chapter 7 case in which the court held that "[t]o permit the untimely commencement of a complex and difficult lender liability litigation of highly dubious merit, which would indefinitely delay the otherwise imminent final distribution and closing of this estate, would constitute an abuse of the Court's discretion").

Against this backdrop, it is not difficult to understand that in approving the cash collateral agreement I did not intend to cede my authority to the Committee. The words employed in the order say nothing to the contrary. What the first paragraph from which I quoted accomplished was to divorce the Committee from the debtor's ratification of the various loan documents for a specified period of time. The second-quoted paragraph treats with the Committee's professionals' ability to be paid out of the bank's cash collateral were the Committee to commence an action. The order says nothing one way or the other about court approval prior to suit.[4]

 As an alternative argument to standing having been conferred by the cash collateral order, the Committee suggests that an order in which I granted it authority to conduct discovery pursuant to Fed. R. Bankr.P.2004 suffices as authority to sue. This is so, according to the Committee, because the Committee made clear in its application for that order that the intended discovery related to possible challenges to the bank's liens under avoidance theories and equitable subordination principles. But the argument that, by signing the Rule 2004 order, the court "implicitly ratified its previous Cash Collateral Order which explicitly gave the Committee the right to object to the validity of the [bank's] liens" suffers from the same infirmity as the argument relating to the cash collateral order itself. I did not in the earlier order authorize or waive my prerogative to authorize suit; thus, I did not "implicitly ratify" anything in the later order. I simply ordered that examinations might proceed under Rule 2004. Period.

### B. Nunc Pro Tunc Approval For An Unauthorized Suit Can Be Granted

 Because the Committee did not receive court approval prior to commencing its adversary proceeding we look to whether retroactive relief is available. The general rule is that adversary proceedings instituted by the creditors' committee on the estate's behalf require prior court approval; in appropriate instances, however, a court may grant retroactive approval. *See In re Catwil Corp.*, 175 B.R. at 364; *In re Chemical Separations Corp.*, 32 B.R. at 819; *Liberty Mutual Ins. Co. v. Official Unsecured Creditors' Committee of Spaulding Composites Co. (In re Spaulding Composites Co. Inc.)*, 207 B.R. 899, 905 (9th Cir. BAP 1996). While courts find that "the better practice is for the plaintiff to secure approval before filing the complaint, [they] will not foreclose the ability of a court to make its approval of the representation retroactive to the time of the filing." *In re Spaulding Composites Co. Inc.*, 207 B.R. at 905. "To hold otherwise would generate needless dismissals and refilings." *Id. (citing In re Catwil Corp.*, 175 B.R. at 365); *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391, 1398 (5th Cir.1987). Moreover, "the overall 'fairness' concept of bankruptcy laws mandates that the debtor's transactions should not pass without examination." *Official Unsecured Creditors' Committee v. Rachles (In re Rachles, Inc.)*, 131 B.R. 782 (Bankr.D.N.J.1991) (*quoting In re Jones*, 37 B.R. 969, 974 (Bankr.N.D.Tex.1984)).

Retroactive approval has been granted, when "time was of the essence" because of a statute of limitations and where there was little "likelihood of confusion" as to who

---

**4.** Interestingly, the second cash collateral order, which covered a period subsequent to the Committee's window to object to the liens, omits the Committee's professionals from the paragraph relating to payment of professionals out of the cash collateral.

would file the adversary proceeding. *In re Catwil Corp.*, 175 B.R. at 365.

Even assuming that our debtor had not waived its right to bring an avoidance action against the bank, it is unlikely that it would have done so, for some of the Committee's claims involve the debtor's guarantee of its non-debtor affiliate's debt to the bank, as to which debt the debtor's insiders are alternative guarantors. Thus, to the extent that the debtor's exposure were eliminated, the insiders' exposure would be augmented. If the Committee cannot bring an action to avoid the guarantee and the resulting security interest, the inherent conflict of the debtor's insiders makes it unlikely that the debtor will plug the gap. In any event, whatever the motivations of those in control of the debtor, the debtor gave up the ability to sue the bank. Therefore, "overall fairness" would require the grant of retroactive approval. *In re Rachles, Inc.*, 131 B.R. at 786. Similar to *Catwil*, there can be no confusion as to who would bring the adversary proceeding, the debtor having contracted away its right to sue and more importantly, the bank having agreed that the Committee had a period of time in which to challenge its liens. *See In re Catwil Corp.*, 175 B.R. at 365.

Although procedurally flawed, the filing of the Committee's adversary proceeding was a good faith attempt to object to bank's liens or security interest fully within the spirit of the cash collateral agreement and order. *See In re Rachles, Inc.*, 131 B.R. at 786. Certainly "time was of the essence" as the Committee would have jeopardized its right to receive reimbursement from the estate (in the face of the grant by the debtor of a lien on proceeds of the bank's collateral) had the Committee not filed its adversary proceeding. *In re Catwil Corp.*, 175 B.R. at 365. While some might argue that the evaporation of a source of payment is not a relevant consideration, if the Committee's professionals could not receive payment over the bank's objection out of the bank's collateral, which here constitutes the bulk of the estate's available assets, potentially beneficial actions might not be undertaken, to the estate's and unsecured creditors' detriment. *See Glinka v. Abra-*

*ham And Rose Company Ltd.*, 199 B.R. 484, 494 (D.Vt.1996).

Under all these circumstances, retroactive approval should be granted if the Committee's action is warranted under the *STN Enterprises* rubric. So it is to those requirements that we turn.

## C. *The Application of STN Enterprises*

To determine whether the implied right of a creditors' committee to bring suit ought in a specific instance be made an explicit grant of approval, or, in the words of *STN Enterprises*, whether the debtor has unjustifiably failed to bring suit, courts in this Circuit apply a two-part test: i) whether the "committee presents a colorable claim or claims for relief that on appropriate proof would support a recovery ..."; and ii) "whether an action asserting such claim[s] is likely to benefit the reorganization estate." *STN Enterprises*, 779 F.2d at 905 (*citing In re Toledo Equipment Co.*, 35 B.R. 315, 320 (Bankr.N.D.Ohio 1983)). Because the creditors' committee is not required to present its proof, the first inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim. *See Tennessee Valley Steel Corp. v. B.T. Commercial Corp. (In re Tennessee Valley Steel Corp.)*, 183 B.R. 795 (Bankr.E.D.Tenn.1995)("Determining whether the Committee has asserted colorable claims in its Amended Complaint is not the equivalent of determining whether the Defendants are entitled to summary judgment."). The mandated cost/benefit analysis involves the weighing of the probability of success and financial recovery, whether it is preferable to appoint a trustee to bring suit instead of the creditors' committee, and "the terms relative to attorneys' fees on which suit might be brought." *STN Enterprises*, 779 F.2d at 905. Although courts will not conduct a minitrial on these issues, a sufficient likelihood of success must be found to "justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *Id.* at 906.

### 1. *Refusal to Sue*

To gain use of the cash collateral, the debtor prospectively gave up its right to

bring an adversary proceeding attacking the bank's liens and security interests. In the cash collateral order, this right was preserved for assertion by the Committee, subject to the court's prior approval before suit was commenced. Patently, in ratifying the loan documents, the debtor has "refused" to sue. Whether such refusal is "unjustified" depends upon which side of the prism one peers through: from the perspective of obtaining essential use of cash collateral, the decision may well be considered justifiable. But from the perspective of the creditors, it may not, depending upon their view of the likelihood of reorganization, the perceived incentive of the guarantor insiders not to increase their financial exposure to the bank, and the cost of the suit they wish to maintain. Recognizing this dichotomy between the perspectives of the creditors on the one hand and the debtor seeking resort to money with which to operate, on the other, one court has observed that "[i]t is not inconceivable that a hypothetical debtor, in order to maintain favorable financial arrangements would collaborate with a hypothetical bank to recognize liens and encumbrances which otherwise might be avoidable." *In re Jones*, 37 B.R. at 973. While "[the rehabilitative] purpose might be served by permitting agreements between debtors and creditors with secured interests to proceed without independent analysis[,] ... [the] rehabilitative purpose is not boundless and the overall 'fairness' concept of the bankruptcy laws mandates that the debtor's transactions should not pass without examination." *Id.*

■ Whenever a cash collateral order contains provisions waiving the debtor's right to attack a creditor's liens or security interests, the debtor is "opposed" to a creditors' committee's adversary proceeding seeking to avoid these security interests. But, standing alone, that should be insufficient either to permit or deny the creditors' committee to institute suit. (Indeed, in many instances, because the debtor has little choice but to ratify the loan documents in order to stay in business, its opposition is theoretical only, the debtor being all too happy to have the

committee intercede. In other instances, as here, there may be reasons why management of the debtor may have a self-interest in restricting the committee from suing.) Where the debtor actively opposes the creditors' committee's request for leave to sue, the court must look at whether, beyond the fact that the debtor had no meaningful choice but to forego litigation, there is a substantial reason why interposition of the proposed suit would be harmful to the estate. *See In re Spaulding Composites Co. Inc.*, 207 B.R. at 904 (holding that when a debtor stipulates to representation by a creditors' committee the relevant consideration is whether the litigation is necessary and beneficial to the estate). If the debtor offers no cogent argument why the estate would be harmed, its protestations ought be ignored and the court ought proceed to consider whether the litigation will benefit the estate.

■ The debtor here gives little in the way of explanation for its opposition to the Committee's action, other than the fact that the debtor did not waive its right to manage its business and estate, including the right to decide whether or not to sue third parties. That, however, is not factually correct, the debtor having ratified the bank's loan, apparently without having looked into the validity of the bank's claims.[5] Moreover, I have already alluded to the stipulation by the bank that the Committee was not bound by the ratification for 30 days; as a result, institution of this suit does not risk the debtor's use of its cash collateral. The only other point the debtor makes is that the alleged oral misrepresentation by the bank's counsel which gives life to the equitable subordination claim was no more than a misunderstanding which had no negative consequences given that the Committee had the right to investigate the validity of the bank's claims. In these circumstances, the debtor says, equitable subordination does not lie. The debtor may well be correct in that observation; however, the Committee has agreed to waive that claim in any event.

---

5. The debtor does not state that it has investigated into the existence of claims against the bank or frailties in its security interests. Instead, the

debtor announces only that it would not allege against the bank any of the claims asserted by the Committee.

### 2. The Litigation Costs

The debtor having offered no persuasive reason why the Committee's suit would be harmful or unwise we turn to whether that litigation will "likely ... benefit the reorganization estate." *In re STN Enterprises,* 779 F.2d at 905. Because the bank stipulated that the Committee had a certain window to challenge the bank's position, approval of this suit will not, in and of itself, imperil the debtor's funding and thereby doom its reorganization effort. Thus we proceed to consider whether there is a fair chance that the benefits to be obtained from the litigation will outweigh its costs. *See Chemical Bank,* 1994 WL 714287 at *3. This inquiry entails estimating the costs of litigation and weighing those costs against the possible outcomes.

Plainly, if successful, the claims asserted by the Committee will redound to the benefit of the estate. The Committee seeks to avoid a portion of the bank's security interest, or in the event the security interest is not avoided, require the bank to first utilize non-debtor collateral to satisfy its lien. As such, success may free up nearly $500,000 value for the estate's reorganization efforts and for a possible increased payout to creditors. As to the expense in achieving this result, I must discount the cost of the Committee's investigation, a cost which it would have incurred in any event. I also discount the cost of drafting the complaint, for if the Committee had sought prior approval to sue, in all likelihood it would have attached to its motion a draft complaint, much as would a litigant seeking leave to amend a filed complaint. The relevant charges thus begin accruing with the onset of discovery. These costs, however, are necessarily less than in the civil arena because the Committee has already investigated the *bona fides* of the bank's claims and liens. In this regard, in its reply to the bank, the Committee declares that it "plans on taking a few depositions and moving for a quick trial." Committee's Reply, p. 16 ¶ 32. And, it assures the court, " the cost will be nominal and the potential benefit to the Committee [and debtor] is quite substantial." Id. at p. 16–17 ¶ 32. Whereas the Committee makes no effort to quantify the "nominal" costs, that exercise is fairly easily performed extrapolating from the billing rates set forth in the retention application for the Committee's counsel.

In addition to the costs of discovery will be the costs of a pretrial order, of the trial itself, of possible post-trial briefing and of transcripts. Counsel's billing rate is $250 per hour. Estimating on the high side so as to be conservative, if we assume that counsel will spend ten eight-hour days in discovery, one day preparing a pretrial order, and ten days preparing for trial, trying the case and preparing a post-trial submission, we can reasonably estimate that his efforts will consume 21 days. If we add to that ten days of paralegal assistance at $85 per hour, we arrive at a cost of $48,800, excluding the cost of transcripts and other disbursements. Adding another $5,000 for transcripts and disbursements, the estimate is somewhere in the neighborhood of $54,000, assuming the case does not settle before trial. Whereas that cost is not nominal in a case of this size, neither is it so high as to be prohibitive if the claims asserted appear to have merit.

### 3. The Likely Merits of the Claims

This brings us squarely to the validity of the claims which the Committee still wishes to press. The first of these surviving claims, styled in the complaint as the second claim for relief, is equitable estoppel. To plead equitable estoppel sufficiently a plaintiff should allege facts showing the extent and depth of its reliance on the opposing parties' conduct and how it was "prejudiced thereby." *Shields v. School of Law, Hofstra University,* 77 A.D.2d 867, 431 N.Y.S.2d 60, 62 (1980) (*quoting Glenesk v. Guidance Realty Corp.,* 36 A.D.2d 852, 321 N.Y.S.2d 685, 688 (1971)). The party seeking estoppel must prove with respect to the estopped party that there was (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts. *See Int'l Minerals and Resources v. Pappas,* 96 F.3d 586, 594 (2d Cir.1996) (internal quotations omitted). With respect to itself, the party asserting estoppel must show: "(1) lack of knowledge of true facts; (2)

reliance upon the conduct of the party estopped; and (3) a prejudicial change in his position." *Id.* at 594.

The crux of the Committee's claim is the misstatement by the bank's counsel of the amount of its direct, secured claim against the debtor. This figure was overstated by some $450,000. That $450,000 was actually a secured guarantee by the debtor of an affiliate's indebtedness. The Committee asserts that the misstatement was deliberate. However, the Committee did not plead or demonstrate reliance on the bank's misstatement or a prejudicial change in position. Although the erroneous amount of the direct loans to the debtor made its way into the cash collateral stipulation (but was later corrected), the motion in support of the stipulation correctly recited that the basis for the bank's secured claim included the guarantee. Just as importantly, the Committee was given the right to investigate into the validity of the bank's claims and liens. Quite obviously, given the stipulated right of the Committee to challenge the bank, there cannot have been a prejudicial change in position. Nor, for the same reason, was there any adjudication by the court of the amount or validity of the bank's claims. Although the Committee may have been confused by the bank's counsel, there was no reliance on what she said. In short, this claim is not colorable and is subject to dismissal either on the theory that if court approval be required it ought not be given or on the theory that if court approval not be required, the Committee has nonetheless failed to state a claim and the deficiency in the claim is not subject to cure through amendment.

The complaint's fourth claim alleges that the debtor's guarantee of its affiliate's mortgage was a transfer or obligation made without fair consideration or reasonably equivalent value and thus is void as a fraudulent conveyance pursuant to 11 U.S.C. § 544(b) and New York Debtor & Creditor Law §§ 270, 271, 272 and 273 et seq. Section 544(b) of the Bankruptcy Code provides in pertinent part that "[t]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an [allowed] unsecured claim." New York Debtor & Creditor Law § 273 provides that

every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Fair consideration exists

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

N.Y. DEBT. & CRED. LAW § 272 (McKinney 1998). Under section 272, a plaintiff attacking a transfer as lacking fair consideration must compare the value of the consideration received against the value of the property transferred. *See United States v. McCombs,* 928 F.Supp. 261, 272 (W.D.N.Y.1995). In its complaint, the Committee alleges that the debtor did not receive fair consideration or reasonably equivalent value for guaranteeing the Winston mortgage because the debtor did not own the encumbered property and did not receive the mortgage loan proceeds. (Complaint, p. 14 ¶ 30). The Committee also alleges that the debtor was insolvent at the time it gave the guarantee, or that the guarantee would have rendered it insolvent, and that the debtor had actual creditors at that time. The bank says that the debtor received consideration in the form of use of the affiliate's property; however, it appears that the debtor may have been paying rent to the affiliate for the use of that property, arguably negating consideration having been given to the debtor. This is not a motion for summary judgment. The fraudulent transfer claim seeking to avoid the guarantee is colorable and the bank's described defense is hardly a "slam dunk."

In its fifth claim for relief the Committee alleges that the debtor's payment of $117,-

197.93 to the bank, on account of the affiliate's mortgage, was a fraudulent conveyance under 11 U.S.C. §§ 544(b), 548 and 549 and New York Debtor & Creditor Law §§ 270, 271, and 273. Section 548(a)(2) of the Bankruptcy Code in pertinent part provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

The Committee pleads that, in the nine months prior to the bankruptcy filing, the debtor paid the bank $117,197.93 on the guarantee, a guarantee unsupported by consideration flowing to the debtor, at a time when the debtor was or was rendered insolvent and had creditors. The bank has raised in its defense the same claim of consideration as with the claim that the guarantee is voidable. As the bank conceded at oral argument, this claim to recoup the monies paid is colorable.

The Committee's sixth claim for relief seeks declaratory judgment that the bank does not have a properly perfected security interest in the debtor's "Megatech" trademark, which has an application presently pending before the trademark office. The bank's prepetition security interest in general intangibles covers "all present and future trademarks." *Security Agreement Schedule A.* None of the Congress, the Supreme Court, the Second Circuit, nor the New York Court of Appeals has spoken definitively on whether a security interest in a trademark is perfected only upon recording it with the trademark office, or whether a filing in accordance with the provisions of the Uniform Commercial Code ("UCC") is adequate. Whereas the weight of such authority is more in line with a determination that the UCC would control, the matter is hardly free from doubt.

The confusion over the appropriate filing place for a security interest in trademarks results from the interplay of state and federal law, the UCC provisions governing security interests and the federal trademark statutes, specifically the Lanham Act. While one commentator has observed that "[t]o date there has been little dissent regarding security interests in trademarks; the consensus is that they are controlled by state UCC law[,]" Alice Haemmerli, *Insecurity Interests: Where Intellectual Property and Commercial Law Collide,* 96 Colum. L.Rev. 1645, 1656 (1996), she also notes that courts have frequently cautioned parties as to potential perfection difficulties, because the provision in the Lanham Act that controls the *assignment* of trademarks is similar to the analogous provision in the Patent Act. *See id.*

Additional confusion has been caused by language in the UCC 9–302(3)(a), the "stepback" provision. *See id.* at 1660. *See* N.Y. UCC 9–302(3)(a) (McKinney 1998). NY UCC 9–302(3)(a) states that

[t]he filing of a financing statement otherwise required by this Article is not necessary or effective to perfect a security interest in property subject to (a) a statute or treaty of the United States which provides for a national or international registration or a national or international certificate of title or which specifies a place of filing different from that specified in this Article for filing of the security interest.

However, case law and a proposed UCC revision clarify that for federal law to supersede the UCC "the federal statute itself must provide a method for perfecting the security interest." Haemmerli, *supra,* at 1663. *See Roman Cleanser Co. v. National Acceptance*

Co. of America (In Matter of Roman Cleanser Co.), 43 B.R. 940, 944 (Bankr.E.D.Mich. 1984) (finding that the Lanham Act only covered assignments of trademarks and not security interests, and holding that a security interest in a trademark is governed by Article 9 of the UCC); Creditors' Committee of TR–3 Industries, Inc. v. Capital Bank (In re TR–3 Industries), 41 B.R. 128, 131 (Bankr. C.D.Cal.1984) (finding that "it was not the purpose or intent of Congress in enacting the Lanham Act to provide a method for the perfection of security interests in trademarks, tradenames or applications for the registration of the same."); see also Joseph v. 1200 Valencia, Inc. (In re 199Z, Inc.), 137 B.R. 778, 782 (Bankr.C.D.Cal.1992). Whereas the strength of the Committee's claim is questionable, the proposal for clarification of the UCC underscores that there is room for disagreement and, therefore, for litigation.

 The committee's seventh claim for relief requests, pursuant to the doctrine of marshaling of assets, that the bank be required to satisfy its secured guarantee claim out of the affiliate's property, and not from the debtor's assets. Because marshaling concerns itself with "competing property interests of liens," state law governs its application. Craner v. Marine Midland Bank, N.A. (In re Craner), 110 B.R. 111, 122 (Bankr.N.D.N.Y.1988), modified on other grounds, Internal Revenue Service v. Craner (In re Craner), 110 B.R. 124 (N.D.N.Y.1989). "[M]arshaling is an equitable doctrine developed to prevent injustice to junior creditors and foster fair dealing, justice and common honesty." Id. (quoting 53 Am.Jur.2d Marshaling Assets § (1970) (footnotes omitted)). The doctrine applies when "there is a common debtor of senior and junior creditors and the senior creditor alone has the right to resort to both a common fund and a separate fund" both of which belong to the common debtor. Fundex Capital Corp. v. Balaber–Strauss (In re Tampa Chain Co. Inc.), 53 B.R. 772, 777–778 (Bankr.S.D.N.Y.1985); see In re Craner, 110 B.R. at 122.

 The bank properly observes that an unsecured creditor may not utilize the doctrine of marshaling. See In re Craner, 110 B.R. at 123. However, at least one decision in this district holds squarely that a trustee, endowed with the status of a secured creditor, may. See In re Tampa Chain Co. Inc., 53 B.R. at 777; see also Chittenden Trust Co. v. Sebert Lumber Co. (In re Vermont Toy Works, Inc.), 135 B.R. 762 (D.Vt. 1991). The Bankruptcy Code vests the trustee "with the rights and powers of an unsatisfied execution creditor." In re Tampa Chain Co. Inc., 53 B.R. at 777 (quoting 11 U.S.C. § 544(a)(2)). Therefore, the trustee exercises the "rights and powers" conveyed to such a creditor under state law. Id. As an unsatisfied execution creditor under New York law, the trustee "has rights to the personal property of a debtor served with a writ of execution superior to all but prior secured creditors and bona fide purchasers for value." Id. at 777–778 (quoting N.Y. Civ. Prac. Law § 5202(a)) (McKinney 1978). Thus, the trustee is deemed a secured creditor. See id. at 778. Because a debtor in possession has all the rights and powers of a trustee, 11 U.S.C. § 1107(a), under the Tampa Chain rationale, standing in the shoes of the debtor in possession, the Committee can assert this claim.

 There is, however, another problem. One of the elements of marshaling is the existence of two or more funds belonging to a common debtor. Ordinarily, this requirement is not met where the two funds sought to be marshaled are held separately, such as by a corporation and its shareholder. See Tampa Chain, 53 B.R. at 778. Certain exceptions have been recognized, for example, where there is fraud or inequitable conduct by the shareholder. See id. at 778–79; see also In re Vermont Toy Works, Inc., 135 B.R. at 769. Here, because the second fund to which the bank alone has resort, the affiliate's property, does not belong to the debtor, marshaling does not apply unless one of the exceptions to the common debtor requirement can be invoked. The Committee's complaint, however, does not allege sufficient facts to call into play any of those exceptions and the claim as pleaded is not sustainable. It being possible that this defect is curable, I will permit the Committee to formulate a revised claim, consistent with its obligations

under Fed. R. Bankr.P. 9011, and seek approval for its interposition on notice to the debtor and the bank.[6]

To conclude, the two fraudulent transfer claims have a fairly good chance of success. They seek, respectively, to avoid the guarantee obligation of some $450,000 and the payments made thereunder of some $117,000. Assuming that the Committee has a factual basis for its allegations, the likelihood of recovery is probably in the neighborhood of 60%. The claim that the security interest in the trademark is unperfected is a longer shot, having more like a 25% chance of recovery. The record does not reveal what value that mark possesses. However, because the facts on this claim appear to be undisputed, the cost to test the Committee's theory is relatively small. Moreover, in light of the joinder of this claim with far stronger ones, it makes little sense to prohibit its assertion when the expense of its pursuit is not great.

I reach a different determination, however, with respect to the equitable estoppel and marshaling claims, both of which are facially defective, as previously explained. Because the flaw in the equitable estoppel claim is not subject to cure, estate funds ought not be squandered through continued litigation. It is possible with respect to the marshaling claim that the Committee could cobble together a sustainable exception to the common debtor rule, but from the facts as alleged, no theory jumps out. Exceptions to the common debtor rule are not easily proven. *See, e.g., In re Vermont Toy Works, Inc.,* 135 B.R. 762 (reversing the bankruptcy court's application of an exception to the common debtor requirement of marshaling). And trying marshaling cases where an exception to the common debtor rule must be proven is an expensive, time-consuming endeavor because the recognized theories such as piercing the corporate veil, alter ego, and fraud, for example, are highly fact-intensive. On the other hand, removing this apparently meritless claim from the complaint should greatly reduce the estimated costs of the litigation. Accordingly, I am dismissing the

marshaling claim without prejudice to an application by the Committee for authority to pursue it if the Committee can demonstrate that it has a reasonable chance of proving what is necessary for the doctrine to be employed. I regard as a reasonable risk for the estate the estimated costs of the litigation which will proceed, that is, no more, and, I expect, a good deal less than $54,000.

As a final note, I am supposed to consider whether appointment of a trustee to pursue the estate's claims is a more prudent manner of proceeding. In light of the substantial learning curve which the Committee enjoys, and because no other party in interest has requested the appointment of a trustee, I see no reason to follow that route.

The Committee is directed to SETTLE an ORDER consistent with this decision.

---

**6.** I require court approval under *STN Enterprises* of any amendment to the marshaling claim because the claim obviously belongs to the estate given that only a trustee may assert it as a hypothetical execution creditor and an unsecured creditor has no standing to do so.